

**NUMBER 13-08-410-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**OSCAR GONZALES, JR.,**         **Appellant,**

**v.**

**THE STATE OF TEXAS,**         **Appellee.**

**On appeal from the 156th District Court of
Bee County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion by Justice Yañez**

Appellant, Oscar Gonzales, Jr., was convicted of two counts of aggravated sexual assault[1] and two counts of indecency with a child.[2] Appellant was given concurrent

---

[1] *See* Tex. Penal Code Ann. § 22.021(Vernon Supp. 2009).

[2] *See id.* § 21.11 (Vernon Supp. 2009).

sentences of seventy-five years' confinement for each count of aggravated sexual assault, ten years' confinement for one count of indecency with a child by exposure, and fifteen years' confinement for one count of indecency with a child by contact. By four issues, appellant contends that: (1) the evidence is legally and factually insufficient; (2) his trial counsel rendered ineffective assistance; (3) the trial court erred by not allowing testimony from one of his witnesses; and (4) the trial court violated his right to a fair trial because of bias and prejudice. We affirm.

## I. BACKGROUND

Police arrested appellant after B.H., a ten-year-old child, told her mother that appellant had exposed his penis to her and her friend, G.A. Appellant was then charged with two counts of aggravated sexual assault and two counts of indecency with a child. The indictment alleged that appellant had: (1) "intentionally or knowingly cause[d] the penetration of the sexual organ of [G. A.], a child who was then and there younger than 14 years of age and not the spouse of [appellant], by [appellant's] finger" (count one); (2) "intentionally or knowingly cause[d] the penetration of the anus of [G.A.], a child who was then and there younger than 14 years of age and not the spouse of [appellant] by [appellant's] sexual organ" (count two); (3) "with intent to arouse or gratify the sexual desire of [appellant], intentionally or knowingly expose[d] [appellant's] genitals, knowing that [B.H.], a child younger than 17 years of age and not [appellant's] spouse was present" (count three); and (4) "with intent to arouse or gratify the sexual desire of [appellant], intentionally or knowingly cause[d] [G.A.], a child younger than 17 years of age and not the spouse of [appellant] to engage in sexual contact by causing [G.A.] to touch the genitals of [appellant]" (count four).

2

The State offered the testimony of, among others: G.A., Dawn Cramer, a former "forensic interviewer" with the Nueces County Children's Advocacy Center; Kimberly Aguilar, G.A.'s mother; Carol McLaughlin, a forensic nurse with Driscoll Children's Hospital; Linda Holder, B.H.'s mother; and B.H. Appellant testified on his own behalf. After hearing the evidence, the jury found appellant guilty of the four counts. Appellant was sentenced to concurrent sentences of seventy-five years' confinement for each count of aggravated sexual assault, ten years' confinement for indecency with a child by exposure, and fifteen years' confinement for indecency with a child by contact. This appeal ensued.

## II. THE EVIDENCE

G.A. testified that she was thirteen and had three sisters. G.A. stated that her biological father had died in an automobile accident five years before appellant's trial. According to G.A., her mother, Kimberly, began dating appellant approximately one year after her father died. G.A. stated that appellant eventually moved into her home.

G.A. testified that on one occasion when she was nine, appellant asked her to go into her "sister's" room and he "dropped [G.A.'s] pants and his and, like touched [G.A.] with his fingers in her private area." G.A. stated that she did not tell anyone what had happened and that "[i]t just started happening, like, maybe twice a week or, you know, sometime like that." G.A. testified that appellant smelled like alcohol when this happened and that appellant acted "[l]ike he didn't know what was going on; like drunk supposedly."

According to G.A., she and appellant told Kimberly what had happened and that Kimberly started crying and "decided that [appellant] needed rehab."[3] G.A. stated

---

[3] G.A. was unable to recall the date of this incident.

3

appellant then left for approximately eight or nine months to attend "rehab." G.A. testified that appellant returned from "rehab" in December of 2005, and approximately a week later, "things got more serious." According to G.A., appellant "started doing that, what he did before, again and—but this time he used his private. . . . He would touch [G.A.] with [his penis] in [her] butt or [her] middle area." When asked what parts appellant would touch with his penis, G.A. responded, "My cookie, like, my middle and my butt." G.A. clarified that she called her "private part" her "middle" and the area where she poops, her "butt." According to G.A., appellant put his penis "in and out in [her] front and back areas" and that it felt uncomfortable and "for some reason, [her] insides would hurt like [appellant] broke something kind of."

The State asked G.A. if she remembered whether appellant ever did "anything with his fingers", and G.A. responded, "He used to lick his fingers and, like, touch his private area, like, to get it wet or something like that, and then, like, touch me with his private area." The following colloquy between the State and G.A. occurred:

[The State]: Okay. And when you're saying your "private area"; you're talking about . . .

[G.A.]: My cookie and my butt.

[The State]: Your cookie and your butt both. Did he ever use his fingers?

[G.A.]: No.

[The State]: To go inside you.

[G.A.]: He used to, like, rub my cookie with his fingers.

G.A. testified that she and B.H. would spend the night at each other's houses and that in February, during the "stock show week," B.H. spent the night at her house on a

4

Wednesday and Thursday.[4]  On that Wednesday, B.H. and G.A.'s sister, Z.A., were at home alone and the three girls "were kind of being nosey" and found some "Girls Gone Wild" video tapes underneath the bed in her mother's bedroom.  According to G.A., the girls watched approximately five minutes of the tape, but because it was "gross," they turned it off and watched "regular T.V."  G.A. explained that the tape was "nasty."  G.A. stated that she was in fourth grade and ten years old when this incident occurred.

G.A. testified that later that day, appellant drove her and B.H. to B.H.'s house to "pick up the bikes to ride bikes."  According to G.A., appellant began talking about the tapes and "said that he wanted to, like, see more . . . ."  G.A. explained that appellant found out that they watched the tapes because he noticed that the tapes were out of order.  G.A. stated that appellant asked her and B.H. if they felt anything "weird" or if they got "wet."

According to G.A., on Thursday, appellant "called" her and B.H. "into the room" and showed the girls certain parts of a video tape of a man and woman having sex.  The State then had the following exchange with G.A.:

[The State]:  How?  What kind of sex?

[G.A.]:          Like doggy-style kind of.

[The State]:  Okay.

[G.A.]:          And, like regular, like, on-top-of-each-other style kind of.

    . . . .

[The State]:  Okay. And so is that what he had been doing with you?

---

[4] G.A. clarified on cross-examination that the incident with B.H. occurred in 2006.

5

[G.A.]:          Not doggy-style but the laying-on-top-of-each-other way.

[The State]: Okay.  Well, didn't you tell the jury a minute ago that he had
                 put his private in you?

[G.A.]:          Yes.  But when he put it in my butt, I would be on my side and
                 he'd be behind me laying side to side.

G.A. testified that after appellant showed them certain parts of the video, the girls went to lie down in G.A.'s room.  G.A. stated that she and B.H. were talking while Z.A. slept in the room.  According to G.A., appellant "came into the room and said, 'Did you like the video,'" and asked the girls if they wanted "to see what sperm looked like."  G.A. stated that they "shrugged" and then appellant "pulled out his middle part and started . . . what do you call it?  Doing this (gesturing). . . .  He started doing this, and he gave me one of those, like, looks . . . like, you know, do you want to try it or something."  G.A. testified that she "started doing it" because she did not know what would happen if she refused.  G.A. stated that eventually "sperm" came out and landed on her hand and on appellant's pants.  According to G.A., appellant told the girls not to tell anyone what had happened and that she "made" B.H. promise not to tell anyone about the incident because G.A. was not sure what would happen if they told someone.  On Friday, B.H. was sick, so her mother took her home.  When G.A. saw B.H. at school the following week, B.H. informed G.A. that she had told her mother what had happened.

G.A. stated that after B.H.'s mother reported the incident, G.A. went to talk to "a lady" and told her what had happened and then G.A. went to Driscoll Children's Hospital, where G.A. was given an examination of her "middle area."  G.A. testified that she then began seeing a counselor.

B.H. testified that two years and three months prior to appellant's trial, she went to

6

spend the night at G.A.'s house on a Wednesday.[5]  According to B.H., she and G.A. watched a video tape called "Girls Gone Wild," and that it was "nasty," so they stopped watching it.  B.H. stated that on Thursday, appellant drove the girls to B.H.'s house to get her bike and more clothes and that en route, the girls told appellant that they had watched the "Girls Gone Wild" video tape.  B.H. testified that later, appellant showed the girls a "clip" of a "sex tape" in his bedroom.[6]  The girls went to G.A.'s bedroom where Z.A. was asleep and began watching a movie.  According to B.H., appellant went into G.A.'s bedroom, sat on G.A.'s bed, "rolled down his pants," asked the girls if they "wanted to see a real one," and "took out his private."  B.H. stated that appellant then asked the girls if they wanted to "see sperm" and "started rubbing it."  B.H. testified that appellant asked if the girls wanted to touch "it," and B.H. said "no" but G.A. said "she didn't care."  According to B.H., G.A. then "started rubbing it" and "sperm came out."  B.H. said that appellant told her not to tell anyone about the incident.  B.H. stated that her mother picked her up on Friday because she had a fever.

B.H. testified that she had planned on keeping the incident a secret, but that her mother "kind of got it out of [her]."  After B.H. told her mother about the incident with appellant, B.H.'s mother reported it to police.

Kimberly testified that, in 2004, while on a "trail ride," appellant went to sleep between G.A. and Kimberly and that G.A. "kept squirming."  When she asked appellant what he was doing to G.A., appellant said that he was not doing anything.  On cross-

---

[5] B.H. stated that she was eleven at the time.

[6] B.H. clarified that this incident occurred on Thursday, February 2, 2006.

examination, Kimberly stated that appellant told her he was "pinching" G.A. Because G.A. kept squirming, Kimberly decided to sleep between G.A. and appellant.

Kimberly stated that in March 2005, G.A. told her that appellant "tried to put something in her bottom"; however, Kimberly did not call CPS or the police because she wanted to ask appellant about it. According to Kimberly, when she asked appellant about the incident, he told her that "he never could have done that" or "hurt" G.A. Kimberly recalled that appellant told her he was having "blackouts," but "he would never hurt [G.A.]." That week, appellant went to court and then went into "rehab." Appellant was in "rehab" from June 2005 until January 2006; however, appellant was allowed furloughs starting in December 2005.

Then in February 2006, G.A. informed Kimberly that she and B.H. had watched the "Girls Gone Wild" video tape.[7] After appellant was arrested, Kimberly asked G.A. if appellant had done anything to her again, and while "point[ing] down there," G.A. said "that [appellant] had been touching her."

Linda testified that her daughter, B.H., had spent Wednesday night and Thursday night at G.A.'s house in February.[8] Linda stated that she had "an overwhelming feeling" that "something was wrong with [B.H.]," so on Sunday she went for a walk with B.H. so that they could talk." When Linda "shared" a story about a family that B.H. knew to demonstrate that sometimes people are not "always good," B.H. informed her that she and G.A. had watched the "Girls Gone Wild" video tape. According to Linda, B.H. explained

_____

[7] On cross-examination, Kimberly stated that Z.A. told her that the girls had watched the video tape.

[8] On cross-examination, Linda clarified that the incident occurred in 2006.

8

that when appellant found out they had watched the video, appellant told the girls "it was time for them to learn about sex." Linda stated that B.H. told her that after the girls had ridden their bikes, "at some point" appellant showed the girls another video tape and said that "when girls begin to get pubic hair, they're ready for sex." According to Linda, B.H. stated "that evening while [B.H.] and [G.A.] were in [G.A.'s] bedroom, [appellant] came in there and asked them if they wanted to see a real one referring to his penis."

Linda testified that B.H. told her that appellant then "exposed" himself and asked if they wanted to see sperm. B.H. informed Linda that appellant then "rubbed himself—" and that G.A. also "rubbed him." According to Linda, appellant told B.H. that she needed to keep the incident a secret because if someone found out, appellant would go to jail. Linda called the police.

McLaughlin testified that she performs an examination of a child victim of a sexual assault either under an "acute situation," wherein "something had happened within three to four days," or in a situation wherein "something happened a month, two months, a year, three years ago." If the situation is not "acute," an appointment is set up for the forensic nurse's examination of the child. According to McLaughlin, it is important to examine the child as soon as possible because she collects evidence for law enforcement, which "can be collected within that ninety-six-hour period of time" and "the sexual organ heals very quickly. So injuries will heal within three to four days." McLaughlin explained that "it's kind of important for us to see them in the beginning so that we can check and make sure there isn't an injury because a month, two months, three months down the line, that injury could have healed completely so we're not going to find an injury."

McLaughlin examined G.A. on February 10, 2006. McLaughlin stated, "The first part

9

of the examination is [to] obtain a history from the child" and that she "needs" to know what part of the body was touched or hurt, so that she can determine if there is an injury. The history that McLaughlin acquires is documented "word for word" in the child's words "so that [McLaughlin] can treat her." G.A. told McLaughlin:

> ["]*My stepdad [appellant], he used to touch me on and in my private.*["] And she indicated her female sexual organ by pointing. ["]*He would take his hands and put them in my private. He would put his hands on my boobs. He would put his private in my butt,*["] and she indicated her anus by pointing. ["]*He would ask me to touch his private. I would. White stuff came out and would go on my hands. This happened more than once.*["]

McLaughlin stated that she did not collect any forensic evidence from G.A. because the incidents G.A. described had not occurred recently. McLaughlin conducted a "detailed genital examination," which is an examination of the female sexual organ utilizing a colposcope, which is a "microscope that magnifies up to thirty times," allowing McLaughlin to "look very closely at that part of the body for injuries." McLaughlin also utilized the colposcope to examine G.A.'s anus. McLaughlin stated that she did not find any injuries to G.A.'s female sexual organ or anus and that "[e]verything looked perfectly normal." On cross-examination, McLaughlin acknowledged that normal findings were "consistent with something not occurring" and "with [a child] not being sexually assaulted."

Cramer testified that she interviewed G.A. at the Children's Advocacy Center. Cramer stated G.A.:

> opens up saying that [appellant] had touched her on her . . . "boobs." She says "boobs" indicating breasts. Later she circles the breast area and says that's what she calls them as "boobs." And then we start talking about—ask her if other things happened and she said that—she starts talking about how . . . I'm trying to remember exact words 'cause there was alot [sic] said during the interview. How he [appellant] puts a stick-like, something that was "stick-like" she calls it in her anal area. She does not call it "anal area"; she calls it, if I'm not mistaken, "booty."

10

Cramer said that G.A. then told her about the incident that occurred when B.H. spent the night at G.A.'s house.

Appellant testified that he left for "rehab" approximately in June 2005. Appellant denied that before going to "rehab," he told Kimberly that he "molested" G.A. or "put "anything" in G.A.'s anus. When asked if he "ever put anything" in G.A.'s vagina or anus, appellant responded, "No." Appellant stated that G.A. and B.H. "made up" the allegations against him and that he had never touched a child inappropriately.

Appellant related that on an unknown date, B.H. spent the night and that after he went to sleep, G.A. woke him up and said that she was going to get in trouble for watching a movie. According to appellant, he did not know what G.A. meant by that comment and told her to leave and let him get some sleep. Appellant testified that he began to worry that the girls had watched the movies he had under the bed, so he could not go back to sleep. Appellant told G.A. to come back, and G.A. said that Z.A., G.A.'s youngest sister, had told Kimberly that they had watched the movies. Appellant stated he then asked G.A. what movies she was talking about and she said the movies that were under the bed. Appellant said, "First thing that [came] to my mind was my probation, okay, 'cause I was trying so hard to not get in any more trouble."[9] Appellant testified that he told Kimberly that the girls had watched the video and that Kimberly already knew because Z.A. had told her. Appellant believed that Kimberly "didn't even care about it."

Appellant stated that he was so worried about getting in trouble, he told Kimberly that he was going to call B.H.'s mother, but that Kimberly asked him not to do that

___
[9] Appellant did not state why he was on probation.

11

because, in a small town, people would find out. According to appellant, he called B.H.'s mother and asked her to pick up B.H. because B.H. said that her stomach hurt; however, appellant did not inform B.H.'s mother that the girls had watched the video tape. Appellant was not sure when B.H. left, but B.H. eventually called the house. When he heard G.A. talking to B.H., he asked to speak to B.H. and told her he needed to talk to her mother and report that she had watched that video. B.H. told him that her mother was not at home. Appellant stated that he asked B.H. to promise not to tell anyone that they watched the video because "it was going to get out in this small town."

## III. SUFFICIENCY OF THE EVIDENCE

By his first issue, appellant contends that the evidence is legally and factually[10] insufficient to support the jury's verdict because the jury relied on the testimony of "two children about 12-13 years old about something that happened when they were just 10, without DNA or medical evidence."[11] According to appellant, "[t]he jury likely assumed his guilt and convicted him without any corroborating or independent eyewitness testimony to support the verdict."

---

[10] In his brief, appellant does not specifically state how the evidence is factually insufficient to support the verdict. *See Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003) (providing "that in a factual sufficiency review the court of appeals is required to consider the most important evidence that the appellant claims undermines the jury's verdict" and is not required to "discuss all the evidence admitted at trial, but a proper factual sufficiency review must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal").

[11] Appellant does not challenge the specific elements of the offenses which he was convicted of committing. A person commits the offense of aggravated sexual assault of a child "if the person intentionally or knowingly . . . causes the penetration of the anus or sexual organ of a child by any means." TEX. PENAL CODE ANN. § 22.021. A person commits the offense of indecency with a child by exposure if that person "with a child younger than 17 years of age . . . with intent to arouse or gratify the sexual desire of any person . . . exposes the person's anus or any part of the person's genitals knowing the child is present." *Id.* § 21.11(a)(2)(A). A person commits the offense of indecency with a child by contact if that person "with a child younger than 17 years of age . . . engages in sexual contact with the child or causes the child to engage in sexual contact." *Id.* § 21.11(a)(1).

12

## A. Standard of Review

In conducting a legal sufficiency review, we view the relevant evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[12] We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact.[13] Instead, we consider whether the jury reached a rational decision.[14]

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence.[15] This Court will not reverse the jury's verdict unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict.[16]

## B. Analysis

G.A. testified that when appellant returned to the home from "rehab," he put his penis "in and out" of her "front and back areas" and that it hurt and felt as if something had broken. G.A. also stated that appellant "rubbed" her "cookie" with his fingers. After appellant was arrested, G.A. told Kimberly that appellant had been "touching her" while she pointed "down there." In her report, McLaughlin stated that, while pointing at her female

---

[12] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)); *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004).

[13] *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).

[14] *Beckham*, 29 S.W.3d at 151.

[15] *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

[16] *Id.* at 417.

13

sexual organ, G.A. reported that appellant "used to touch" her "on and in [her] private." Cramer testified that G.A. told her that appellant put a "stick-like" object in her "booty."

G.A. testified that when B.H. spent the night at her house, appellant came into her room, exposed his penis, and she "rubbed" appellant causing "sperm" to come out of his penis. G.A. stated that B.H. witnessed the act. B. H. testified that appellant "took out his private" and "started rubbing it." According to B.H., G.A. "rubbed" appellant's penis until "sperm came out." B.H. stated that appellant made her promise not to tell anyone about the incident. Linda testified that B.H. informed her that appellant had exposed his penis and rubbed it in front of G.A. and B.H. B.H. also told Linda that G.A. "rubbed" appellant's penis.

Appellant argues that there was no corroborating or medical evidence presented to support G.A.'s and B.H.'s testimony; however, the testimony of a child sexual abuse victim alone is sufficient to support a conviction for aggravated sexual assault and indecency with a child.[17] Therefore, viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant committed the offenses of aggravated sexual assault and indecency with a child

[17] Tex. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005) (providing that "[a] conviction under Chapter 21, Section 22.011, or Section 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred" and if the victim is under the age of seventeen at the time of the alleged offense, "[t]he requirement that the victim inform another person of the an alleged offense does not apply"); Ozuna v. State, 199 S.W.3d 601, 606 (Tex. App.–Corpus Christi 2006, no pet.) ("The testimony of a child sexual abuse victim alone is sufficient to support a conviction for aggravated sexual assault.") (citing TEX. CODE CRIM. PROC. ANN. art. 38.07; Garcia v. State, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978)); Connell v. State, 233 S.W.3d 460, 466 (Tex. App.–Fort Worth 2007, no pet.) ("A complainant's testimony alone is sufficient to support a conviction for indecency with a child.") (citing TEX. CODE CRIM. PROC. ANN. art. 38.07; Garcia, 563 S.W.2d at 928).

by exposure and contact.[18]  Furthermore, viewing the evidence in a neutral light, we cannot conclude that the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence.[19]  We conclude that the evidence is legally and factually sufficient.  We overrule appellant's first issue.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

By his second issue, appellant contends that his trial counsel rendered ineffective assistance by failing to present the testimony of an expert witness "to dispute that sexual assaults as the State alleged cannot be supported by the medical evidence."[20]

## A. Standard of Review and Applicable Law

Ineffective assistance of counsel claims are evaluated under the two-part test articulated by the Supreme Court in *Strickland v. Washington*.[21]  The *Strickland* test requires the appellant to show that counsel's performance was deficient, or in other words, that counsel's assistance fell below an objective standard of reasonableness.[22] Assuming appellant has demonstrated deficient assistance, he must then show that there is a

---

[18] *See Hooper*, 214 S.W.3d at 13; *Escamilla*, 143 S.W.3d at 817.

[19] *See Watson*, 204 S.W.3d at 414-15.

[20] In his second issue, appellant also urges this Court to "reverse this case for insufficiency of the evidence . . . based on lack of medical verification of the alleged sexual assaults."  We have already addressed this assertion in section III and concluded that the evidence is legally and factually sufficient to support the verdict.

[21] *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

[22] *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 687.

15

reasonable probability that, but for counsel's errors, the result would have been different.[23]

In determining the validity of appellant's claim of ineffective assistance of counsel, "any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight."[24]

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence.[25] Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy.[26] A reviewing court will not second-guess legitimate tactical decisions made by trial counsel.[27] Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions.[28]

## B. Analysis

An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.[29] Here, the record is silent

---

[23] *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 694.

[24] *Thompson*, 9 S.W.3d at 813.

[25] *Id.*

[26] *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.).

[27] *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) ("[U]nless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate . . . .").

[28] *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851.

[29] *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 814 (setting out that "in the vast majority of cases, the undeveloped record on direct appeal will be insufficient for an appellant to satisfy the dual prongs of *Strickland*"); *see Jackson v. State*, 877 S.W.2d 768, 771-72 (Tex. Crim. App. 1994) (en banc) (stating that "we must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he made all significant decisions in the exercise of reasonable professional judgment" and that "[d]ue to the lack of evidence in the record concerning trial

regarding trial counsel's reason for not securing an expert witness. Therefore, appellant has not overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy.[30] Moreover, "[c]ounsel's failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony."[31] Appellant makes no such showing.[32] Therefore, appellant has not met his burden to prove ineffective assistance of counsel by a preponderance of the evidence.[33] We overrule appellant's second issue.[34]

## V. EXCLUSION OF EVIDENCE

By his third issue, appellant contends that the trial court erroneously excluded the testimony of Aaron James Terry.[35] Appellant argues that if allowed, Terry's testimony would have "caused some doubt on the credibility of [Linda], the mother of [B.H.] who first made a statement against [appellant]."

---

counsel's reasons" for the alleged ineffectiveness, the court was "unable to conclude that appellant's trial counsel's performance was deficient" (internal quotations omitted)).

[30] *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851.

[31] *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983).

[32] *Ex parte McFarland*, 163 S.W.3d 743, 758 (Tex. Crim. App. 2005) (concluding that the appellant failed to show prejudice because he did not "show that the unknown witnesses were available to testify or that their testimony would have benefitted him").

[33] *Thompson*, 9 S.W.3d at 813.

[34] We note that appellant generally asserts that "[t]rial counsel's deficient performance, falling well below and [sic] acceptable standard totally undermines the confidence that the jury reached a proper and just verdict"; however, he does not provide a clear and concise argument with citation to authority for this assertion. Therefore, he has waived it. *See* TEX. R. APP. P. 38.1(i).

[35] Appellant also complains that the trial court excluded evidence that "a family member of [G.A.] had [allegedly] gone to prison for a similar offense." However, appellant has not provided a clear and concise argument with appropriate citations to authorities. Therefore, appellant has waived this complaint. *See id.*

17

## A. Standard of Review and Applicable Law

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard.[36] We will uphold the trial court's ruling if the record reasonably supports the ruling, and the ruling is correct under any theory of law applicable to the case.[37]

There are limitations pursuant to the rules of evidence regarding introducing extraneous acts for purposes of attacking a witness's credibility.[38] Specifically, rule 608(b) states that "specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence."[39]

## B. Analysis

The State filed a motion in limine seeking to exclude Terry's testimony under Texas Rules of Evidence 608, 613(b), 401, 402, and 403. At trial, appellant argued that the trial court should deny the State's motion because "a wider latitude on impeachment should be granted on the defense regarding witnesses" and that "if a witness has engaged in the same kind of conduct that they are testifying in [sic] at trial against . . . involving that very

---

[36] *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008).

[37] *Id.* at 418.

[38] *See* TEX. R. EVID. 608(b).

[39] *Id.*; *see id.* R. 609(a) ("For the purpose of attacking the credibility of a witness, evidence that a witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party.").

same type of charge that that's absolutely relevant to their credibility . . . ." The trial court held a hearing outside the presence of the jury, wherein Terry testified that in 2003, when he was fourteen, in an unrelated case, Linda allegedly engaged in illegal conduct but was not arrested or convicted.[40] Citing rule 608, the trial court granted the State's motion and excluded Terry's testimony.

Appellant sought admission of Terry's testimony regarding Linda's alleged prior act for the sole purpose of impeaching Linda's credibility. It was proper for the trial court to exclude that evidence because under rule 608, a witness's credibility may not be attacked by offering extrinsic evidence concerning specific prior instances of conduct, other than a conviction under rule 609, which is not applicable here.[41] Therefore, we conclude that the trial court did not abuse its discretion and overrule appellant's third issue.

## VI. TRIAL COURT'S BIAS

By his fourth issue, appellant contends that the trial court was biased against defense counsel and "showed prejudice against them, conducting the trial in a hostile environment which violated [his] rights to a fair trial." Specifically, appellant states that the "trial court made outrageous comments and was argumentative with defense counsel." Appellant complains of the following:

1. Referring to whether the State can bring in allegations from 2004 in a trial over indictment from 2006—prior allegations never charged [the trial court stated]:

(a) "Well I guess you take that chance 'cause [sic] I don't know the

---

[40] Terry testified that he did not report Linda's alleged improper conduct to the police.

[41] *See id*. R. 608(b); *Billodeau v. State*, 277 S.W.3d 34, 39-40 (Tex. Crim. App. 2009) ("Rule of Evidence 608(b) provides that a witness's credibility may not be impeached with specific instances of the witness's conduct other than a criminal conviction as provided in Rule 609(a).") (citing TEX. R. EVID. 608(b)).

law and we're not briefing that today."

(b)     "I have no clue, don't know the research on it."[42]

2.     Commenting on Judge's lack of control over her courtroom:

(a)     "[Defense counsel], I'm the boss.  You don't like me being the boss; [the prosecutor] doesn't like me being the boss.  I'm the boss of the courtroom and y'all [sic] aren't letting me be the boss."

(b)     "Y'all [sic] are running this courtroom and it's mine."

3.     The judge committed improper conduct in treating defense counsel in appropriately [sic] in front of the jury.  [Defense counsel] outside the presence of the jury, complain[ed] as follows:

"I have sat here and [co-defense counsel] have sat here for basically two days now having you belittle us in front of the jury where we have not commented on your actions.  All right?  Pointing your fingers at us just like you did in front of the jury and basically demeaning the defense team in front of the hometown jury.  That's improper."

4.     After the testimony of [Terry], Counsel for the defense . . . asked the court:

[Defense counsel]:   Your Honor, while we're on the record, just make a very brief statement about why we have offered this.

[Trial Court]:        Yes, sir.

[Defense Counsel]:  I mean, I know—

[Trial Court]:        *You can't do anything briefly*, but go ahead.

Appellant argues that based on the above examples, "[c]learly, the attorneys tried this case

---

[42] We note that appellant has taken these two comments out of context from three pages in the record wherein the trial court explained to the State and defense that it was not aware of whether or not the State was "barred" from prosecuting appellant for the extraneous offenses described by G.A. during appellant's trial if he were found "not guilty."

in a hostile environment" as stated in *Abdygapparova v. State*.[43]

Although appellant generally cites *Abdygapparova*, he has not provided a clear and concise argument supporting his assertion that the trial court was biased and prejudiced. Nonetheless,

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 65 L. Ed. 481, 41 S. Ct. 230 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.* at 28 (internal quotation marks omitted). Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.[44]

Furthermore, there is a presumption of judicial impartiality when reviewing whether impermissible bias was present.[45]

The record reveals that the jury was not present in each incident listed above, except when the trial court stated, "Y'all [sic] are running this courtroom and it's mine." However, that comment was made at a bench conference when the trial court admonished the State for asking an inappropriate question in front of the jury. Furthermore, although

---

[43] 243 S.W.3d 191 (Tex. App.–San Antonio 2007, pet. ref'd).

[44] *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

[45] *See Abdygapparova*, 243 S.W.3d at 198.

21

defense counsel generally complained to the trial court that it had "belittled" the defense team in front of the jury, appellant did not specifically state which actions, other than pointing her fingers at the defense team, the trial court did to "belittle" the defense team.[46]

Here, none of the complained-of comments were directed at appellant or bore upon the presumption of his innocence.[47] Rather, the allegedly improper statements were all directly aimed at either the defense or the State and were mostly made outside the presence of the jury. Although the statements and gestures undoubtedly reveal the trial court's frustration with appellant's trial counsel and the State, none go beyond the bounds of expressions of dissatisfaction that imperfect people can sometimes express.[48] In light of the preceding, we cannot conclude that these exchanges, either separately or collectively, demonstrate the type of impermissible bias that could violate an individual's right to a fair trial. We overrule appellant's fourth issue.

## VII. CONCLUSION

We affirm the trial court's judgment.

Do not publish.
TEX. R. APP. P. 47.2(b)

LINDA REYNA YAÑEZ,
Justice

Delivered and filed the
24th day of June, 2010.

---

[46] We note that on appeal, appellant points out that his trial counsel made the remark to the trial court; however, he does not point to any instances in the record where the trial court actually pointed at his trial counsel.

[47] See Jasper v. State, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001) (providing that "a trial judge's irritation at the defense attorney does not translate to an indication as to the judge's views about the defendant's guilt or innocence").

[48] See Liteky, 510 U.S. at 555-56.

22